IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY R. BASLEY, | : | CONSOLIDATED UNDER |
| | : | MDL 875 |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| A-C PRODUCT LIABILITY TRUST, | : | E.D. PA CIVIL ACTION NO. |
| ET AL., | : | 2:11-30128-ER |
| | : | |
| Defendants. | : | |

## O R D E R

**AND NOW,** this **11th** day of **August, 2015**, it is hereby
**ORDERED** that Defendant M.A. Hanna Company's Motion for Partial
Summary Judgment on grounds that it did not own the ships at
issue (Doc. No. 77) is **GRANTED**; its Motion for Partial Summary
Judgment on grounds that it was not Plaintiff's employer (Doc.
No. 76) is **DENIED.**[1]

---

[1]     This case was transferred in January 2011 from the
United State District Court for the Northern District of Ohio to
the United States District Court for the Eastern District of
Pennsylvania, where it became part of the MDL-875 MARDOC docket.

Plaintiff alleges that he was exposed to asbestos
while working aboard various ships, and that he developed an
asbestos-related illness as a result of that exposure. Plaintiff
brought claims against various defendants, including claims
against Defendant M.A. Hanna Company, a successor to Hanna
Mining Company ("Hanna Mining" or "Defendant") for
unseaworthiness under the general maritime law, and for
negligence under the Jones Act. The ship for which Plaintiff
asserts Defendant is liable for asbestos exposure thereon (as
owner of the ship and/or as his employer while aboard the ship)
is:

• George A. Stinson – November 1989 – January 1992

Defendant has moved for partial summary judgment, arguing that Plaintiff's claims fail for one or both of the following reasons: (1) it was not the owner of the ship and, therefore, cannot be liable for unseaworthiness, and (2) it was not Plaintiff's employer during his work aboard the ship, and therefore cannot face liability under the Jones Act.

The parties agree that Plaintiff's claims are governed by maritime law, including the Jones Act.

## I. **Legal Standard**

### A. Summary Judgment Standard

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A motion for summary judgment will not be defeated by 'the mere existence' of some disputed facts, but will be denied when there is a genuine issue of material fact." Am. Eagle Outfitters v. Lyle & Scott Ltd., 584 F.3d 575, 581 (3d Cir. 2009) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248 (1986)). A fact is "material" if proof of its existence or non-existence might affect the outcome of the litigation, and a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

In undertaking this analysis, the court views the facts in the light most favorable to the non-moving party. "After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party." Pignataro v. Port Auth. of N.Y. & N.J., 593 F.3d 265, 268 (3d Cir. 2010) (citing Reliance Ins. Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997)). While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the non-moving party who must "set forth specific facts showing that there is a genuine issue for trial." Anderson, 477 U.S. at 250.

### B. The Applicable Law

Plaintiff's claims arise under federal law (general maritime law as well as the Jones Act). In matters of federal

2

law, the MDL transferee court applies the law of the circuit where it sits, which in this case is the law of the U.S. Court of Appeals for the Third Circuit. Various Plaintiffs v. Various Defendants ("Oil Field Cases"), 673 F.Supp.2d 358, 362-63 (E.D.Pa.2009) (Robreno, J.). Therefore, the Court will apply Third Circuit law in deciding Defendants' motion.

To the extent that resolution of the issues herein involves matters that are governed by substantive state law, the Court will apply the appropriate state's law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938); see also Guaranty Trust Co. v. York, 326 U.S. 99, 108 (1945).

## C. Shipowner Status (General Maritime Law - Unseaworthiness)

Under maritime law, the owner of a ship has a "non-delegable duty to provide seamen a vessel that is reasonably fit for its purpose." Calhoun v. Yamaha Motor Corp., U.S.A., 40 F.3d 622, 631 (3d Cir. 1994); see also Earles v. Union Barge Line Corp., 486 F.2d 1097, 1102 (3d Cir. 1973). A seaman who is injured as a result of the condition of a ship may bring a claim against the shipowner for "unseaworthiness." Id. In certain circumstances, an individual or entity who does not own the ship may become a "pro hac vice" owner, thus facing potential liability for unseaworthiness. See Matute v. Lloyd Bermuda Lines, Ltd., 931 F.2d 231, 235 (3d Cir. 1991); Aird v. Weyerhaeuser S.S. Co., 169 F.2d 606, 609-10 (3d Cir. 1948). Such a situation arises where an individual or entity enters into a "demise charter." Matute, 931 F.2d at 235; Aird, 169 F.2d at 609-10; The Doyle, 105 F.2d 113, 114 (3d Cir. 1939). A demise charter exists when the charterer of the ship is given "sole possession and control of the vessel for voyage or service contemplated." Aird, 169 F.2d at 611; see also Matute, 931 F.2d at 235 (defining "demise charterer" as "one who contracts for the vessel itself and assumes exclusive possession, control, command and navigation thereof"). Such a charter is also referred to as a "bareboat charter." Reed v. Steamship Yaka, 307 F.2d 203, 205 (3d Cir. 1963), rev'd on other grounds by 373 U.S. 410, 83 S. Ct. 1349 (1963); see also Rao v. Hillman Barge & Const. Co., 467 F.2d 1276, 1277 (3d Cir. 1972); Hawn v. Pope & Talbot, Inc., 198 F.2d 800, 802-03 (3d Cir. 1952).

Under Third Circuit law, a defendant to a maritime law unseaworthiness claim may seek indemnity from another entity. SPM Corp. v. M/V Ming Moon, 22 F.3d 523, 526 (3d Cir. 1994) (citing M & O Marine, Inc. v. Marquette Co., 730 F.2d 133, 135

3

(3d Cir. 1984) ("'when indemnification is sought either under a maritime contract or under a theory of primary/secondary negligence based on a maritime tort, federal maritime law applies' and permits such indemnification").

## 1. Reed v. S.S. Yaka

In Reed v. S.S. Yaka, 373 U.S. 410, 83 S. Ct. 1349 (1963), the United States Supreme Court held that a third-party defendant brought into the case by way of an indemnity claim brought by a ship's owner was potentially liable for unseaworthiness under the general maritime law because it was a pro hac vice owner of the vessel by way of a demise charter at the time of the plaintiff's injury. In doing so, it explained:

> Pan-Atlantic[, the third party defendant,] was operating the Yaka as demisee or bareboat charterer from [the owner,] Waterman. Under such arrangements full possession and control of the vessel are delivered up to the charterer for a period of time. The ship is then directed by its [(the charter's)] Master and manned by his crew; it makes his voyages and carries the cargo he chooses. Services performed on board the ship are primarily for his benefit. It has long been recognized in the law of admiralty that for many, if not most, purposes the bareboat charterer is to be treated as the owner, generally called owner pro hac vice.

373 U.S. at 412.

## 2. Matute v. Lloyd Bermuda Lines, Ltd.

In Matute v. Lloyd Bermuda Lines, Ltd., 931 F.2d 231 (3d Cir. 1991), the United States Court of Appeals for the Third Circuit considered whether a defendant was a pro hac vice owner of a ship, by way of a "demise charter," and concluded that it was not. 931 F.2d at 235. Instead, the court determined that the contractual relationship was a "time charter" in name and in fact, such that the defendant did not face potential liability as a shipowner under general maritime law. The court reasoned that (1) the agreement between the shipowner (Procoast) and the defendant charterer was entitled a "Time Charter," (2) under its provisions, the owner (Procoast) was to bear (a) the responsibility for and control over the vessel, the captain and the crew, (b) including their hiring and firing. The Third

4

Circuit stated that "courts are hesitant to imply a relinquishment of possession and control by the owner of a ship absent the most explicit language indicating that the owner completely and exclusively gives up 'possession, command, and navigation' of the vessel to the charterer." 931 F.2d at 235. (citing Guzman v. Pichirilo, 369 U.S. 698, 699, 82 S. Ct. 1095, 1096, 8 L.Ed.2d 205 (1962)). It concluded that, "there simply is no evidence of such a relinquishment by [the owner,] Procoast."

### 3. Aird v. Weyerhaeuser S.S. Co.

Aird v. Weyerhaeuser S.S. Co., 169 F.2d 606, 609-10 (3d Cir. 1948), was another case in which the Third Circuit addressed the status of an agent or charterer as a pro hac vice owner of a ship. In doing so, it explained that mere terminology on documents is not determinative of "ownership" status for purposes of assessing shipowner liability. It also held that there is a presumption against a finding of a demise charter, unless it is clear that such was the intention of the shipowner and the agent or charterer entering into the contractual relationship. In reaching its determination, the court put particular emphasis on the fact that the owner of the ship had been disclosed to the plaintiff in writing in his employment contract. Specifically, the Third Circuit wrote:

> If the owner of the vessel has given **entire possession and control of it to another by virtue of a demise charter** or otherwise and the master is, therefore, the agent of the charterer and not of the owner, the person thus put in possession and control of the vessel becomes special owner for the voyage and assumes all the responsibilities of owner . . . . **Such a person is frequently described as 'owner pro hac vice'** which is merely a convenient expression to indicate that he stands in the place of the owner for the voyage or service contemplated and bears the owner's responsibilities, even though the latter remains the legal owner of the vessel.

> In the case before us **the shipping articles which [Plaintiff] Aird signed with the master and which thus constituted his contract of employment showed on their fac[e] that the United States, through its agency the U.S. Maritime Commission, was the owner** of the vessel. Since Carlson, the master, was in fact the agent of

5

the United States **it is clear that the articles
disclosed to Aird that the United States was the
employer to whom he must look** for his wages. It
necessarily follows that Aird's claim, if he has any,
arising from his discharge from employment on the Walt
Whitman is against Carlson as master and the United
States as owner and against them alone, unless the
relationship of Weyerhaeuser to the vessel was such as
to impose liability upon it as owner of the vessel pro
hac vice or in some other way as Aird's employer.

Weyerhaeuser, as we have seen, was acting in this
transaction solely as general agent for the United
States in the general capacity of ship's husband. **The
form of service agreement under which it acted has
been authoritatively held not to constitute the
general agent the owner of the vessel pro hac vice.**
Nonetheless, under the service agreement it did have
responsibility for procuring persons for employment as
members of the crew and it did so procure Aird. But
since in so doing Weyerhaeuser was acting solely as
agent for the owner and **inasmuch as its principal was
disclosed to Aird on the face of the articles which he
signed it did not thereby become a party to the
employment contract** or liable for wages due thereunder
even if we assume that it and not the master actually
hired Aird.

**We do not overlook the fact that the shipping
articles which Aird signed contained the statement
that Weyerhaeuser was 'charterer' of the vessel.** We do
not think that this fact aids Aird, however. In the
first place **it is perfectly clear that this statement
was erroneous and that Weyerhaeuser was acting solely
as agent of the United States in the general capacity
of ship's husband and was in no sense a [demise]
charterer.** In the second place even if true it would
not without more compel the conclusion that
Weyerhaeuser would be liable for the wages of the
seamen of the Walt Whitman. For there are two distinct
kinds of charter parties. On the one hand are those by
which the use of the vessel is given without full
possession and control of it. Such a charter party is
frequently no more than a contract of affreightment.
On the other hand, however, are those **demise charters
under which the charterer is given sole possession and**

6

**control of the vessel for the voyage or service which is contemplated. As we have seen it is only in the case of a charter of the latter sort that the charterer becomes owner pro hac vice and liable** for the seamen's wages. **There is, however, a general presumption that the owner does not mean to put his vessel into the possession of the charterer to this extent.** Accordingly Aird would not be justified in relying upon the statement in the articles that Weyerhaeuser was charterer as a basis for holding it liable as his employer.

169 F.2d at 609-11 (emphasis added). Ultimately, the Third Circuit held that the employer facing potential liability to Plaintiff Aird was the United States, and not the defendant agent Weyerhaeuser – despite the fact that Weyerhaeuser was identified as a "charterer" in the plaintiff's employment agreement.

D. Employer Status (Jones Act)

The Jones Act creates a cause of action for negligence against an injured seaman's employer. Cosmopolitan Shipping Co. v. McAllister, 337 U.S. 783, 790, 69 S. Ct. 1317, 1321 (1949). A claim under the Jones Act lies only against the seaman's employer – and may not be brought against any other entity. Id.; Matute, 931 F.2d at 235-36. Ordinarily, the shipowner is also the employer of the seaman, although this need not be the case. Id. at 236. Where an individual or entity is retained by a shipowner to handle certain duties in connection with the ship, a question may arise as to who the "employer" is, for purposes of asserting a claim under the Jones Act. The Supreme Court addressed this situation in Cosmopolitan Shipping Co., where it wrote:

The issue in this case is whether a construction of the Jones Act carrying out the intention of Congress to grant those new rights to seamen against their employers requires or permits a holding that the general agent under the contract here in question is an employer under the Jones Act. The decision depends upon the interpretation of the contract between [the plaintiff seaman] and Cosmopolitan[, the general agent,] on one hand and that between Cosmopolitan and the United States[, who owned the ship and retained Cosmopolitan to work as a general agent, 'handling certain phases of the

7

business of ships owned by the United States'] on the
other. We assume without deciding that the rule of the
Hearst case applies, that is, **the word 'employment'
should be construed so as to give protection to seamen
for torts committed against them by those standing in
the proximate relation of employer, and the rules of
private agency should not be rigorously applied.** Yet
this Court may not disregard the plain and rational
meaning of employment and employer to furnish a seaman a
cause of action against one completely outside the
broadest lines or definitions of employment or employer.

.         .         .         .

The solution of the problem of determining the employer
under such a contract depends upon determining whose
enterprise the operation of the vessel was. **Such words
as employer, agent, independent contractor are not
decisive. No single phrase can be said to determine the
employer. One must look at the venture as a whole.** Whose
orders controlled the master and the crew? Whose money
paid their wages? Who hired the crew? Whose initiative
and judgment chose the route and the ports? It is in the
light of these basic considerations that one must read
the contract.

337 U.S. at 795 (added internal quote at 785) (emphasis added).
The Third Circuit has addressed the issue more recently, and has
held that, "[t]he existence of the employment relationship is a
question of fact, and the inquiry turns on the degree of control
the alleged employer exerts over the employee." Reeves v. Mobile
Dredging & Pumping Co., Inc., 26 F.3d 1247, 1253 (3d Cir. 1994)
(citing Matute, 931 F.2d at 236). It has specified that,
"[f]actors indicating control over the seaman include payment,
direction, and supervision. Also relevant is the source of the
power to hire and fire." Matute, 931 F.2d at 236.

Although it is true that, in 1949, the United States
Supreme Court held in Cosmopolitan Shipping Co. that "under the
Jones Act only one person, firm, or corporation can be sued as
employer," 337 U.S. at 791, it has more recently been held by
the Third Circuit (and other Circuits) that a Jones Act
plaintiff may have more than one employer, and that more than
one employer can be liable for the same injury. Neely v. Club
Med Management Services, Inc., 63 F.3d 166, 173, 203 (3d Cir.
1995) (citing Simeon v. T. Smith & Son, Inc., 852 F.2d 1421,

1428-31 (5th Cir.1988); Self v. Great Lakes Dredge & Dock Co.,
832 F.2d 1540, 1545-48 (11th Cir.1987); Joia v. Jo-Ja Service
Corp., 817 F.2d 908, 915-18 (1st Cir.1987)); see also Guidry v.
South Louisiana Contractors, Inc., 614 F.2d 447, 452 (5th Cir.
1980).

## 1.  Cosmopolitan Shipping Co. v. McAllister

In Cosmopolitan Shipping Co., the plaintiff brought
Jones Act claims against Cosmopolitan Shipping Co.
("Cosmopolitan"), alleging that it was liable for the negligence
of the master and/or crew of a vessel for failing to take
precautions against - and failing to provide proper treatment
for - poliomyelitis that he contracted, which therefore resulted
in permanent injury. Cosmopolitan had been retained by the War
Shipping Administration to "manage[] certain phases of the
business of ships owned by the United States and operated by the
War Shipping Administration," pursuant to "the terms of the
wartime standard form of agency agreement," which was known as
the General Agency Service Agreement. 337 U.S. 785-87. In the
space on the shipping articles entitled "Operating Company on
this Voyage" there was written "Cosmopolitan Shipping Co., Inc.,
as general agent for the United States." The articles were
stamped at the top as follows: "You Are Being Employed By the
United States." Id. at 785-86.

The Supreme Court held that the agent (Cosmopolitan)
was not the plaintiff's employer and that plaintiff therefore
had no Jones Act claim against it. Instead, it found that the
Government was plaintiff's employer. In doing so, it undertook
four main considerations: (1) there was no evidence that
Cosmopolitan ever gave orders or directions as to the route or
management of the ship while on voyage, (2) the Court found that
the language of the General Agency Agreement (and the conduct of
the parties) made clear that "the United States had retained for
the entire voyage the possession, management, and navigation of
the vessel and control of the ship's officers and crew to the
exclusion of the general agent" (Id. at 795), (3) the
considerations which led to the establishment of the War
Shipping Administration (and the Shipping Articles), and (4) the
means and source of payment of the crew and incidental ship
expenses.

With respect to the second of these considerations
(the General Agency Agreement), the Court noted that the terms
of the General Agency Agreement indicated that: (a) Cosmopolitan

9

had been "appointed by the United States 'as its agent and not as an independent contractor, to manage and conduct the business of vessels assigned to it;'" (b) the general agent agreed to "manage and conduct the business for the United States, in accordance with such directions, orders, or regulations as the latter has prescribed, or from time to time may prescribe;" (c) the general agent engaged itself to, specifically, (i) "maintain the vessels in such trade or service as the United States may direct," (ii) "collect all moneys due the United States" under the agreement, (iii) "equip, victual, supply and maintain the vessel, subject to such directions, orders, regulations and methods of supervision and inspection as the United States may from time to time prescribe," (iv) "arrange for the repairs of the vessels" and to "exercise reasonable diligence in making inspections and obtaining information with respect to the state of repair and condition of the vessels," (v) "procure the Master of the vessels operated hereunder, subject to the approval of the United States" (whereby the "Master shall be an agent and employee of the United States, and shall have and exercise full control, responsibility and authority with respect to the navigation and management of the vessel"), (vi) "procure and make available to the Master for engagement by him the officers and men required by him to fill the complement of the vessel" (whereby the "officers and members of the crew shall be subject only to the orders of the Master. All such persons shall be paid in the customary manner with funds by the United States hereunder.") Id. at 795-96. In short, the Court found that, pursuant to the terms of the General Agency Agreement, "the **duties of the respondent were expressly and intentionally limited to** those of a ship's husband who has been engaged to **take care of the shoreside business of the ship** and who has **no part in the actual management or navigation of the vessel**." Id. at 796 (emphasis added).

      With respect to the third of the four main considerations (i.e., the considerations which led to the establishment of the War Shipping Administration, and the Shipping Articles), the Court explained that: (a) the United States through the master of the ship retained full control over the navigation and physical operation of the vessel; (b) the general agent had the responsibility of husbanding the vessel and his duties were to victual, supply, maintain, and repair the ship - and he did not have duties (typically belonging instead to a berth agent) relating to the handling and loading of cargo and other port services such as wharfage and pilotage needed by the vessel; (c) neither the possession nor management of the

vessel was conferred on Cosmopolitan; (d) the discretion vested in the agents was decreased by the master contracts which the United States executed for the furnishing of numerous services and supplies required by the vessels; (e) There were detailed instructions issued by the War Shipping Administration as to the terms of the contracts which the agents were authorized to enter into, and these contracts were required to be executed in the name of the United States as principal; (f) it was essential that the masters and crews be government employees in order to obviate strikes and work stoppages, to insure sovereign immunity for the vessels, and to preserve wartime secrecy by confining all litigation concerning operation of the vessels to the admiralty courts where appropriate security precautions could be observed; (g) The crew were to be hired by the master of the ship [i.e., a government employee] and were to be subject to his orders only, such that the crew hired became employees of the United States and not of the general agent; (h) "The shipping articles complied with the tenor of the General Agency Agreement . . . by making it clear that respondent was an employee of the United States."

With respect to the last of the four considerations (i.e., payment of crew and incidental expenses), the Court noted:

> In order to pay the crew and the other expenses incidental to the operation of the ship, the **War Shipping Administration deposited funds in a special joint bank account** set up in the name of the agent 'as general agent for the War Shipping Administration.' From this special account the general agent drew the funds and turned them over to the master to pay the crew. **No money of the general agent was used for this purpose or in the operation of the vessel.**

Id. at 800 (emphasis added).

### 2. Matute v. Lloyd Bermuda Lines, Ltd.

Matute was a case in which an injured seaman brought Jones Act claims (and other claims under the general maritime law) against both an exclusive charterer of the ship (Lloyd Bermuda Lines)("LBL") and an agent of that charterer (Trans-Mar Agencies)("TMA"). The Third Circuit was faced with determining whether either of these entities had been the seaman's employer

11

and, thus, whether they faced potential liability under the Jones Act. It began by stating:

> The existence of an employer-employee relationship is a question of fact; the critical inquiry turns on the degree of control exercised over the crewman. Factors indicating control over the seaman include **payment**, **direction**, and **supervision**. Also relevant is the source of the **power to hire and fire**.

931 F.2d at 236 (emphasis added).

The plaintiff, who had suffered an eye injury aboard the ship, believed that TMA had been his employer because, as set forth in his affidavit, "all my communications, every document and letters, all my arrangements for joining the ship, for leaving the ship and for my airline ticket was made by Trans-Mar." In seeking to establish that TMA had been his "employer," the plaintiff relied specifically upon the following facts and evidence: (1) a letter guaranteeing Matute employment, which, though signed by the ship's captain, was written on TMA stationery; (2) TMA arranged and paid for Matute's transport from Newark airport to the vessel; (3) TMA's representative came aboard the vessel each time it was docked in Newark to inquire as to the well-being of the crewmen; (4) TMA's representative arranged for Matute's visit to the eye doctor in New York City; (5) after Matute's discharge by the ship's captain, TMA arranged and paid for Matute's return trip to his home country.

In general, the role of the charterer (LBL) had been to provide services for the ship (through its agent, TMA), such as: obtaining crewmembers' immigration visas, meeting arriving crew at the airport, arranging and paying for transportation to the port, making advances to pay for certain expenses of the ship and crew while docked in New Jersey (the amounts to be deducted from Procoast's monthly charter hire fee (plus 2 1/2% commission)), assisting with the repatriation of foreign crewmen returning to their countries (by preparing immigration documents and making the necessary travel arrangements).

The Third Circuit determined that neither entity was the plaintiff's employer – and that he therefore had no Jones Act claim against either one. Without explicitly stating as much, the Third Circuit indicated that it was actually the ship's owner (Procoast, who was apparently not named as a defendant in the action), who had been the plaintiff's employer.

12

In setting forth its rationale, the court explained that (1) the charterer (LBL) was not ultimately responsible for payments made by TMA for plaintiff's transportation and that, under the terms of the time charter, LBL would be reimbursed by the owner (Procoast) for these expenses (plus a 2.5% commission); (2) the services provided by LBL through TMA did not involve the control, direction, and supervision over the plaintiff necessary to constitute an employer-employee relationship; and (3) the owner (Procoast), through the ship's captain, hired the plaintiff, terminated him, set the amount of his wages, was responsible for paying him, and supervised him in his position as oiler.

### 3.   Neely v. Club Med Management Services, Inc.

In Neely, a plaintiff injured by boat propellers during her work as a scuba instructor at the Club Med Holiday Village resort in St. Lucia brought Jones Act claims (as well as general maritime law unseaworthiness claims) against four defendants: (1) Club Med, Inc., (2) Club Med Sales, Inc., (3) Club Med Management Services, Inc. ("Club Med Management"), and (4) Holiday Village (St. Lucia) Ltd. (a wholly owned subsidiary of Club Med, Inc.) ("Holiday Village"). The plaintiff was injured when the captain of the boat put the ship's engine into reverse after plaintiff had jumped into the water, thus sucking plaintiff under the boat and into the ship's propellers, which were not shielded by propeller guards. The scuba diving expeditions plaintiff led took place on a small fleet of boats operated by Holiday Village, including the Blue Lagoon (owned by Club Med), and the Long John (chartered by Holiday Village from its title owner – an individual living in Miami, Florida). The boat from which plaintiff's injury was sustained was the Long John.

At the completion of a trial, and in response to special interrogatories specifically pertaining to the Jones Act claims, the **jury found that the plaintiff had been employed by both Club Med Management and Holliday Village, that each of those defendants had been negligent,** and that their negligence was a substantial factor in causing the plaintiff's injuries. 63 F.3d at 173. Upon cross-appeals filed by the parties, the Third Circuit held that **these defendants' liability on the Jones Act claims was joint and several** (and clarified that this was not to be misconstrued as strictly several). Id. at 203-04.

E.    Joint Venturer Liability

Under both Delaware law and Ohio law, as is generally true under other states' laws, a third person who has a claim growing out of a breach of duty by the joint venture is entitled to recover for his entire claim against any member of the joint venture. See Hudson v. A.C. & S. Co., Inc., 535 A.2d 1361, 1363 (Del. Super. 1987) (citing 48A C.J.S. Joint Ventures § 63 at 507). Each joint venturer is liable to third persons for the acts of other members of the joint venture within the scope of the joint venture. Id.; see also Clifton v. Van Dresser Corp., 73 Ohio App.3d 202, 211, 596 N.E.2d 1075, 1080 (Ohio App. 1991); Al Johnson Const. Co. v. Kosydar, 42 Ohio St.2d 29, 32, 325 N.E.2d 549, 552 (Ohio 1975); U.S. v. USX Corp., 68 F.3d 811, 826 (3d Cir. 1995)("Each member of a joint venture 'is considered the agent of the others, so that the act of any member within the scope of the enterprise is charged vicariously against the rest.'") (quoting Pritchett v. Kimberling Cove, Inc., 568 F.2d 570, 579-80 (8th Cir.1977)(citing Restatement (Second) of Torts § 491), cert. denied, 436 U.S. 922, 98 S. Ct. 2274, 56 L.Ed.2d 765 (1978)).

Under both Delaware law and Ohio law, as is generally true under other states' laws, "a joint business adventure, compositively defined, is an association of persons with intent, by way of contract, express or implied, to engage in the carry out a single business adventure for joint profit, for which purpose they combine their efforts, property, money, skill and knowledge, without creating a partnership, and agree that there shall be a community of interest among them as to the purpose of the undertaking, and that each coadventurer shall stand in the relation of principal, as well as agent, as to each of the other coadventurers, with an equal right of control of the means employed to carry out the common purpose of the adventure." Ford v. McCue, 163 Ohio St. 498, 127 N.E.2d 209 (Ohio 1955; see also State ex rel. Ohio Civ. Serv. Emps. Assn. v. State, 2013 -Ohio-4505, 2 N.E. 3d 304 (Ohio App. 2013); J. Leo Johnson, Inc. v. Carmer, 38 Del. Ch. 579, 156 A.2d 499 (Del. 1959); Warren v. Goldinger Bros., Inc., 414 A.2d 507 (Del. 1980); 46 Am. Jur. 2d Joint Ventures § 1.

The Delaware Supreme Court has broken down this definition into five separate elements: (1) a community of interest in the performance of a common purpose, (2) joint control or right of control, (3) a joint proprietary interest in

the subject matter, (4) a right to share in the profits, (5) a duty to share in the losses which may be sustained. Warren, 414 A.2d 507.

Ohio Courts have delineated a similar set of elements: (1) a contract, express or implied; (2) the intent to associate as joint venturers; (3) contributions from each co-venturer to the common enterprise; (4) equal control or authority of the co-venturers over the enterprise, (5) an agreement to share profits and a sharing of losses, (6) a single enterprise as opposed to a continuing business. Carey v. Seeley's Ceramic Service, Inc., 1994 WL 124849 (Ohio App. (2d Dist.) 1994); see also Mill Creek Builders, Inc. v. James Waltz Custom Builders, 1991 WL 270419 (Ohio App. (6th Dist.) 1991).

## II.  Defendant's Motions for Summary Judgment

### A.  Defendant's Arguments

#### Wrong Shipowner

Defendant contends that Plaintiff's claim for unseaworthiness pursuant to the general maritime law fails because it was never the owner (or even the owner pro hac vice) of the ship for which Plaintiff contends it is liable: the George A. Stinson. According to Defendant, an unseaworthiness claim lies only against the owner (or owner pro hac vice) of a vessel.

In support of this contention, Defendant has submitted a U.S. Coast Guard Abstract of Title, which is maintained by the U.S. Coast Guard National Vessel Documentation Center. (Doc. No. 77-3.) Defendant points to the fact that the abstract of title for the George A. Stinson indicates that the ship was built for National Steel Corporation in 1978 and was owned by that corporation until 1984 (when it was sold to Skar-Ore Steamship Corporation ("Skar-Ore Steamship"), and that beginning in 1988 – and continuing during the entire period at issue for this ship (1989-92) – the vessel was owned by Wilmington Trust Company ("Wilmington Trust"), as trustee owner for the benefit of GATX Third Aircraft Corporation (which had, for the first two days after sale to Wilmington Trust Company, been owned as trustee owner for the benefit of General Foods Credit Investors No. 1 Corp). According to Defendant, the vessel was demise (bareboat) chartered to Stinson, Inc. in 1988 (continuing through the entire period of Plaintiff's work aboard the ship).

15

## Wrong Employer

By way of separate motion, Defendant contends that Plaintiff's claim for negligence pursuant to the Jones Act fails because it was not Plaintiff's employer during his work (and alleged asbestos exposure) aboard the ship at issue: again, the George A. Stinson. According to Defendant, a negligence claim pursuant to the Jones Act lies only against the plaintiff's employer – and, under Third Circuit law, direction, supervision, and payment are activities of an employer. Defendant also asserts that, under caselaw arising outside of the Third Circuit, it has been held that the name on the side of a ship is evidence of the identity of the employer of a seaman aboard that ship – and that, in general, it is the owner of a ship (or owner pro hac vice) who is the employer of the seamen aboard the ship.

With respect to the George A. Stinson, Defendant Hanna Mining asserts that (1) (a) the owner of the ship during the pertinent time period was Wilmington Trust Company, while (b) the owner pro hac vice of the ship during that time was Stinson, Inc. It further asserts that (2) unlicensed crewmembers employed aboard the ship (a) acted under the direction and supervision of Stinson, Inc., and (b) participated in the health, pension, and other benefit plans of Stinson, Inc. In addition, it asserts that (3) it was Stinson, Inc. who paid Plaintiff for his work aboard this ship. Defendant contends that it (or its predecessor) merely acted as an agent for the ship.

In support of these contentions, Defendant relies upon the following evidence:

- U.S. Coast Guard Abstract of Title - *George A. Stinson*

    Defendant includes the Coast Guard "General Index or Abstract of Title" for the George A. Stinson, which indicates that the ship was built for "National Steel Corporation" in 1978 and owned by that corporation until 1984 (when it was sold to Skar-Ore Steamship Corporation), and that beginning in 1988 – and continuing during the entire period at issue for this ship (1989-92) – the vessel was owned by Wilmington Trust Company, as trustee owner for the benefit of GATX Third Aircraft Corporation (which had, for the first two days after sale to Wilmington Trust Company,

been owned as trustee owner for the benefit of General Foods Credit Investors No. 1 Corp).

(Doc No. 76-3)

- Social Security Administration Payroll Records
  Defendant includes information provided by a private records service (Renillo Record Services), which it contends includes information from official Social Security Administration payroll records, indicating that, during the period at issue (November 1989 to January 1992), Plaintiff received payment from, among other employers, Stinson, Inc.

  The Court notes, upon review of the document attached, that (1) unlike other entries on the document, the entry for Stinson, Inc. does not identify the specific quarters of the years (1989 to 1992) during which the payments were made (and instead leaves the columns for "1st Qtr," "2nd Qtr," "3rd Qtr," and "4th Qtr" blank), and (2) the document omits page 6, which may have contained additional information pertaining to the years 1989 to 1992 (as page 5 ends with payments from 1975 and page 7 begins with payments (for unspecified quarters) in 1989.

  (Doc No. 76-4)

- Paychecks for Other Workers
  Defendant includes two paychecks from December of 1988 (with paystubs attached) for two other individuals (whose job titles and locations of work are not visible on the documents), which identify the issuer of the paycheck as "Stinson, Inc."

  (Doc No. 76-13)

- Photo of the *George A. Stinson*
  Defendant includes a photo of the George A. Stinson, which shows the name "National Steel Corporation" displayed on the side of the ship.

  (Doc No. 76-17)

• Certificates of Discharge

  Defendant includes four separate certificates of
  discharge of Plaintiff from the George A. Stinson
  during the years at issue, which indicate the
  "Name of Employer" as "M.A. Hanna Co." twice
  (December 1989 and January 1991), and "Stinson,
  Inc.-M.A. Hanna A[gent]" twice (November 1991 and
  January 1992).

  (Although the photocopy of the documents has cut
  off the end of the entry on the last two
  certificates so that only "Stinson, Inc.-M.A.
  Hanna A" appears, it appears that, as Defendant
  asserts, the entry is indicating that Stinson,
  Inc. was the owner of the ship and that M.A.
  Hanna was identified as an "agent".)

  (Doc No. 76-5)

• Declaration of John S. Pyke, Jr.

  Defendant includes the declaration of Mr. Pyke,
  who is a former Vice President and General
  Counsel (among other job roles) for Defendant
  M.A. Hanna's predecessor (Hanna Mining), employed
  by Hanna Mining beginning in 1968 and continuing
  until sometime during or after 1979. Mr. Pyke
  provides testimony that:

  (1) Hanna Mining was appointed general agent by
  various vessel owners who authorized it to act in
  place of the owners in "handling, caring for and
  managing" at least eight different vessels;

  (2) In 1985, Hanna Mining changed its name to
  M.A. Hanna Company – which Mr. Pyke refers to
  collectively (stating "The Hanna Mining
  Company/M.A. Hanna Company (hereinafter
  'Hanna');"

  and

  (3) Hanna acted as the general agent of the
  George A. Stinson from the time it was built in
  1978 (for National Steel Corporation) and through
  March 1992 (at which point it was owned by

  18

> Wilmington Trust Company as trustee owner, and
> GATX Third Aircraft Corporation as beneficial
> owner);
>
> During the period March 1988 to March 1992, (i)
> the vessel was bareboat (demise) chartered to
> Stinson, Inc. (with Stinson, Inc. being a pro hac
> vice owner of the vessel), (ii) its crew was
> employed by Stinson, Inc., (iii) unlicensed
> crewmembers were paid by Stinson, Inc., (iv)
> unlicensed crew members acted under the direction
> and supervision of Stinson, Inc.; and (v)
> unlicensed crew members participated in Stinson,
> Inc. health, pension, and other benefit plans.

(Doc No. 76-6.)

Defendant acknowledges that two of the four discharge
certificates pertaining to Plaintiff's discharges from the ship
at issue indicate that the "employer" was "M.A. Hanna Co."
(while the other two identify it as being an agent ("Stinson,
Inc.-M.A. Hanna A[gent]"). However, Defendant asserts that the
mere use of the term "employer" or "agent" or "independent
contractor" on a discharge certificate is not determinative of
the legal status of an entity. Defendant asserts that it is
identified as "employer" on some of the discharge certificates
because, during the years at issue, it acted as the general
agent of the George A. Stinson.

## B. Plaintiff's Arguments

### Error! Main Document Only.Wrong Employer

Plaintiff does not dispute that a negligence claim
pursuant to the Jones Act lies only against the plaintiff's
employer. Rather, Plaintiff asserts that Defendant identified
itself as – and held itself out to be – Plaintiff's employer
aboard the vessel at issue. It asserts that, despite an explicit
contractual obligation to do otherwise, it failed to disclose
its status as an agent managing vessels.

Without directly stating as much, Plaintiff suggests
that Defendant was one and the same as (and with) the entity
that bought the ship from National Steel (i.e., Skar-Ore
Steamship) and also, on paper, sold the ship to Wilmington Trust

Company in 1988 (again, Skar-Ore Steamship). Specifically, Plaintiff asserts that Defendant was one of four entities that entered into an intercompany agreement (also including Skar-Ore Steamship, National Steel, and Hansand Steamship). Plaintiff contends that the evidence indicates that (1) Defendant negotiated insurance and benefits for employees such as Plaintiff (and made the logistical arrangements around those, including payroll deductions), and that (2) the pension funds for Plaintiff were actually co-mingled funds from all four companies. Although Plaintiff does not specifically identify what role or relationship was held by Stinson, Inc. (the entity that Defendant contends was Plaintiff's employer), he seems to imply that Stinson, Inc. was merely an agent or manager for Plaintiff's true employer, which was one (and all) of the entities acting together in a joint venture (including, inter alia, Defendant M.A. Hanna, Skar-Ore Steamship, National Steel, and (presumably) Wilmington Trust).

Plaintiff argues that he should not have to guess who to sue - and he notes that Defendant can seek indemnity from whichever of the other entities it deems appropriate.

In support of these contentions, Plaintiff relies upon the following evidence:

- Certificates of Discharge
  Plaintiff includes discharge certificates for his discharge from the George A. Stinson (summarized already above) as well as approximately two dozen other seamen who worked aboard various ships during the same general time period, which indicate throughout that the "Employer" was sometimes identified as "M.A. Hanna" or "Hanna Mining Co." - but was sometimes (seemingly inconsistently) named as "Hanna Mining Co. Agents."

  (Doc Nos. 92-6 and 92-7)

- Management Agreement with Hanna Furnace
  Plaintiff includes an agreement dated January 1, 1963 between The Hanna Furnace Corporation and The Hanna Mining Company, which reflects an agreement for Hanna Mining to act as "Managing Agent" for a ship not at issue in this case (the George R. Fink), which Hanna Furnace owns. The

20

agreement indicates that Hanna Mining may pay "wages, extra compensation, overtime, bonuses, payroll taxes . . . vacation allowances, damages or compensation for death or personal injury or illness, insurance premiums, Social Security taxes, state or federal unemployment insurance taxes and contributions  and other payments . . . to a pension, welfare or similar fund (and that Hanna Furnace will reimburse it for these payments).

With respect to the duties of the Managing Agent, the agreement indicates that Hanna Mining will, inter alia, "manage and conduct the business of the Owner's vessel," including (1) "all matters with respect to voyages," (2) procuring and providing "all services incidental thereto," including but not limited to, port activities, wharfage and dockage, pilotage, canal transits and services of subagents, (3) collecting and remitting or depositing to Owner's account all monies due the Owner," (4) "equip, victual, supply and arrange for inspection and repair of the vessels," and including "maintenance and voyage repairs and replacements," (5) procure all officers and men required to fill the complement of the vessels, (6) keep records and accounts, (7) if required, "adjust, settle, and liquidate the business of the vessel," (8) handle activities with respect to cargos, charters, rates of freight and charges, and procure services incidental thereto, (9) issue shipping documents, freight contracts, and bills of lading, (10) procure or provide insurance against all insurable risks of any kind.

The agreement also indicates that the owner will indemnify Hanna Mining for "any and all claims and demands . . . of whatsoever kind or nature, whether or not such claim or demand arises from or is based upon the negligence of the master or crew of the vessel, and by whomsoever asserted, for injury to persons or property arising out of or in any way connected with the activities, maintenance or business of said vessels."

21

The agreement states that it will be in effect until December 31, 1968.

(Doc No. 92-8 at 13-21.)

• Intercompany Agreements as to Pension Plans,
  Management, and Insurance
  Plaintiff includes correspondence and an
  agreement, which indicate that Hanna Mining
  negotiated group benefits, including health
  insurance, not only for itself, but also, acting
  as an agent, for Skar-Ore, National Steel,
  Hansand Steamship, Hanna Coal and Ore, and Hanna
  Furnace.

(Doc Nos. 92-8 to 92-10)

Plaintiff maintains that the existence of an
employment relationship is a question of fact and that the
inquiry turns on the degree of control the alleged employer
exerts over the employee. In support of this assertion,
Plaintiff relies upon Reeves v. Mobil Dredging and Pumping
Company, Inc., 26 F.3d 1247 (3d Cir. 1994) (citing Matute v.
Lloyd Bermuda Lines, 931 F.2d 231, 236 (3d Cir. 1991)), and
Osorio v. Texaco, Inc., 1990 WL 65709 (E.D. Pa. 1990). Plaintiff
asserts that "control" includes the power to determine the route
of the ship and the activities of the crew and, for this
assertion, relies upon Cosmopolitan Shipping Company v.
McAllister, 337 U.S. 789, 69 S. Ct. 1370 (1949). He asserts
that, pursuant to the rule set forth in Mastute, some of the
factors demonstrating "control" include payment, direction,
supervision, and discretion to hire and fire.

## Wrong Shipowner

Plaintiff does not dispute that an unseaworthiness
claim lies only against the owner (or owner pro hac vice) of a
vessel. Rather, Plaintiff contends that Defendant held itself
out as the pro hac vice owner of the vessels it managed
(including the George A. Stinson). Specifically, Plaintiff
contends that the evidence indicates that Defendant considered
the vessels at issue to be part of its fleet, and that it
treated all of the vessels alike (whether it owned them or was
appointed as an agent to manage them).

Again, without directly stating as much, Plaintiff suggests that Defendant was one and the same as (and with) the entity that bought the ship from National Steel (i.e., Skar-Ore Steamship) and also, on paper, sold the ship to Wilmington Trust Company in 1988 (again, Skar-Ore Steamship). Specifically, Plaintiff asserts that Defendant was one of four entities that entered into an intercompany agreement (also including Skar-Ore Steamship, National Steel, and Hansand Steamship). For example, Plaintiff contends that the evidence indicates that Defendant negotiated insurance and benefits for crewmembers on behalf of itself, Skar-Ore Steamship, National Steel, and Hansand Steamship. Although Plaintiff does not specifically identify what role or relationship he contends was held by Stinson, Inc. (the entity that Defendant contends was the demise charterer of the ship), he seems to imply that Stinson, Inc. was merely an agent or manager for the true owner of the ship, which was one (and all) of the entities acting together in a joint venture (including, inter alia, Defendant M.A. Hanna (or its predecessor Hanna Mining), Skar-Ore Steamship, National Steel, and (presumably) Wilmington Trust).

Again, Plaintiff suggests that he should not have to guess who to sue - and that Defendant can seek indemnity from whichever of the other entities it deems appropriate.

In support of these contentions, Plaintiff relies upon the following evidence:

- Agreements With National Steel Corporation (re: Other Vessels and Future Vessels) Plaintiff includes three agreements (dated January 1, 1950, January 1, 1955, and January 1, 1960) between The M.A. Hanna Company and National Steel Corporation. Each of the agreements indicates that (1) National Steel "does hereby put and place the handling, care and management of its vessels, [including, "any other vessels hereafter acquired" by National Steel] for the transportation of iron ore and other bulk cargoes on the Great Lakes." Each agreement also indicates that (2) M.A. Hanna Company "does hereby accept the handling, care and management of said vessels and agrees to use its best efforts in such handling care and management and to attend to all business matters and details in connection therewith."

(Doc No. 92-2)

• 1984 Management Agreement With Skar-Ore Steamship
  (re: Management of *George A. Stinson* and Other
  Vessels)
  Plaintiff includes a "Management Agreement" dated
  August 31, 1984 between Defendant Hanna Mining
  Company and Skar-Ore Steamship Corporation, which
  reflects an agreement for Hanna Mining to manage
  four vessels (including the George A. Stinson).
  The agreement indicates that:

  (1) Skar-Ore appoints Hanna Mining "as its
  agent to manage the operation and to conduct the
  business of the Vessels,"

  (2) Hanna Mining "agrees to manage the operation
  and to conduct, as agent only, the business of
  the Vessels in accordance with the orders of the
  Company,"

  (3) "Nothing in this Agreement shall be
  construed as giving [Hanna Mining] control or
  possession of any Vessel or as having any
  interest whatever in the business, profits,
  insurance proceeds or liabilities resulting from
  the operation of any vessel,"

  (4) "Ultimate control over the operation and
  navigation of the Vessels shall remain with
  [Skar-Ore],"

  (5) Hanna Mining "shall perform all the customary
  duties of a managing agent," which, in
  particular, requires it to:

  (a) "[a]ssist [Skar-ore] in the selection and
      engagement of suitable Master, officers and
      crew personnel for each Vessel,"
  (b) "[c]ause to be furnished to each Vessel,
      provisions, fuel, fresh water, stores,
      supplies and equipment required for the
      business of such Vessel,"
  (c) "[a]ppoint local agents for the business of
      each Vessel,"

24

(d) "[a]rrange for and, when necessary, supervise periodic drydockings and routine and casualty repairs to the extent authorized and approved by [Skar-Ore],"

(e) "[m]aintain, in separate accounts, which shall be subject to audit by [Skar-Ore] at reasonable times, an accounting of the funds advanced to [Hanna Mining] for operation of the Vessels,"

(f) "[a]rrange for the loading and discharging of cargoes; the preparation and execution of bills of lading; and in general provide what is known as 'Traffic Management' for each Vessel and each Vessel's business if and to the extent required by [Skar-Ore],"

(g) "[a]s instructed by [Skar-Ore], arrange for Marine Hull and Machinery, P. & I., War Risk and other insurance with such underwriters, with such limits and at such premium rates as the Company shall approve,"

(h) "[a]s instructed by [Skar-Ore], receive, handle, supervise and arrange for the adjustment of Hull and P. & I. claims,"

(i) "[a]ssist [Skar-Ore] in the negotiation of bargaining contracts with labor organizations; review and discuss labor problems and in general perform what is referred to as "Labor Management" in connection with the operation and business of each Vessel," and

(j) "maintain a qualified staff of personnel adequate to perform the operations required under this Agreement."

(Doc No. 92-3)

- 1988 Management Agreement With Stinson, Inc.
  (re: Management of *George A. Stinson*)
  Plaintiff includes a unilaterally executed
  "Management Agreement" dated March 25, 1988
  between M.A. Hanna Company and Stinson, Inc.
  (signed by Defendant M.A. Hanna Company, but not
  signed by Stinson, Inc.), which reflects an
  agreement for M.A. Hanna to manage the George A.
  Stinson. The agreement indicates that:

25

(1)   Stinson, Inc. is a "bareboat charterer,"

(2) M.A. Hanna is appointed manager of the vessel,

(3) M.A. Hanna is to "perform all the customary duties of a managing agent," including a list of duties similar to those set forth under the agreement discussed above (in connection with the Skar-Ore agreement),

(4) "Nothing in this Agreement shall be construed as giving [M.A. Hanna] control or possession of the Vessel . . . [and that] [u]ltimate control over the operation and navigation of the Vessel shall remain with [Stinson, Inc.]."

(5) M.A. Hanna "shall not hold itself out or represent itself as the owner or charterer of the Vessel, but shall always disclose its agency, the name of [Stinson, Inc.], and that [Stinson, Inc.] is a bareboat charterer of the Vessel,"

(6) "The responsibility of the employment of the vessel shall remain at all times with [Stinson, Inc.]," although M.A. Hanna shall "[a]ssist [Stinson, Inc.] in the selection and engagement of a suitable Master, officers and crew personnel for the Vessel;" and "[m]aintain a qualified staff of personnel adequate to perform the operations required under this Agreement;" and "The Master, officers and crew of the Vessel shall at all times be the servants of [Stinson, Inc.]," although "[t]he hiring, discharging and disciplining of the master . . . the officers and the crew is a matter that is [merely] subject to the affirmative approval of master and [Stinson, Inc.]," and "[M.A. Hanna] shall have the right to shift the master, officers and other vessel personnel from the Vessel to vessels of another owner whose vessels are managed by [M.A. Hanna] with the prior written consent of [Stinson, Inc.]."

(7)   Stinson, Inc. "will advance to [M.A. Hanna] the funds necessary to conduct the business of

the Vessel. . . . [M.A. Hanna] shall make monthly remittances of all federal, state or local withholding taxes and of all pension, welfare or vacation contributions relating to the officers and crew of the Vessel."

(8) Stinson, Inc. "shall protect [M.A. Hanna] against liability or claims of liability by including [M.A. Hanna] as an insured in all [policies against liability on the Vessel]," and

(9) Stinson, Inc. "hereby indemnifies [M.A. Hanna] against all liability for personal injury claims and collision claims, and any other losses or liabilities which may result directly or indirectly from the operation of the Vessel, whether or not caused by negligence of [M.A. Hanna] or its employees."

(Doc No. 92-4)

- 1951 Agreement With Hansand Steamship Corporation (re: Management of *Joseph H. Thompson*) Plaintiff includes an agreement dated July 5, 1951 between Hansand Steamship Corporation (a Delaware Corporation) and Hanna Coal & Ore Corporation, which reflects an agreement for Hanna Coal & Ore Corporation to manage the Marine Robin (whose name was later changed to the Joseph H. Thompson). The agreement does not indicate what state law governs it.

(Doc No. 92-5)

- Deposition Testimony of Paul Aquilla Plaintiff cites to deposition testimony (from another action) of Mr. Aquilla, who worked as an Assistant Fleet Engineer for the Hanna Dock and Vessel Department. Mr. Aquilla initially testified that Hanna Mining owned only 1 and 1/3 vessels, but then he later discussed another seven vessels as well (and one under construction at the time of Mr. Aquilla's employment with Hanna: the George A. Stinson), which Plaintiff asserts he referred to as "The Hanna Fleet" (although, in the excerpt of the deposition

transcript submitted on the docket, Mr. Aquilla
never refers to the vessels by this name).

He testified that (1) his work for Hanna Dock and
Vessel Department included (a) communicating with
the vessels regarding repairs needed (either by
land phone or by personally visiting the boats),
(b) ordering supplies for the vessels, (c)
supervising renovation of vessels, (d) retaining
companies to perform renovation work, (e)
performing design functions and developing
specifications for repairs for the whole fleet of
vessels, and (f) overseeing renovations. He
provides testimony that (2) others from "Hanna"
oversaw renovations, (3) for at least one vessel,
"Hanna" paid for the renovations, and (4) "Hanna"
approved specifications for work on the vessels,
including replacement of insulation with
asbestos.

In particular, Plaintiff quotes the following
portions of Mr. Aquilla's deposition:

A:   Right, but the design functions that I have
     been talking to you about apply to the whole
     fleet.
Q:   Even the ships that were operated by Hanna?
A:   That's correct.
Q:   And owned by others.
A:   That's correct yes.

              .         .         .

Q:   Mr. Aquilla, just a couple of questions. My
     name is Reg Kramer. I want to ask you about
     the work you performed for Hanna with regard
     to the supervision of major repairs and some
     of the design work that you and your
     department might have done with respect to
     those repairs. When it came to the
     specifications for those sort of repairs,
     who was responsible for specifying the
     insulating materials that would replace
     existing materials?
A:   By and large the shipyards.

Q: Did you have to approve those specifications
   before they would be performed on the Hanna
   ships?

A: Yes.

Having reviewed the deposition transcript, the
Court notes also that Mr. Aquilla testified that
(1) National Steel was one of "the Hanna
companies," (2) of the eight ships discussed as
being in "the fleet," he testified that (a) five
were owned by National Steel, (b) 1 and 1/3 were
owned by "Hanna," and (c) he believed one was
owned by Hanna Furnace (which he testified was
managed by "Hanna"), although he was not certain,
and (3) his work included ordering asbestos-
containing materials, and approving replacement
of insulation with asbestos-containing material.

(Doc No. 92-11)

• Discovery Responses of Defendant
  Plaintiff cites to the discovery responses of
  Defendant, which indicate that (1) in 1985, The
  Hanna Mining Company changed its name to "M.A.
  Hanna Company" (a Delaware corporation), (2) in
  1929, a different corporation, "The M.A. Hanna
  Company" (an Ohio corporation), helped form
  National Steel Corporation and subsequently acted
  as manager of its vessels, (3) Hansand Steamship
  Corporation was formed in 1951 and, in 1971, was
  an equal joint venture among three corporations,
  including The Hanna Mining Company, and (4) The
  Hanna Mining Company agreed to assume the
  liabilities and obligations of National Steel
  Corporation under a Memorandum of Agreement dated
  January 1, 1960 (but only the liabilities
  accruing after the assignment's effective date of
  November 1, 1961, and only those pertaining to
  certain vessels – which do not include the George
  A. Stinson).

(Doc No. 92-12)

In essence, Plaintiff suggests that Defendant is
liable for the vessel at issue because Hanna Mining (a
predecessor of Defendant M.A. Hanna) (1) was an equal joint

venturer with Skar-Ore Steamship and National Steel (which joint venture Plaintiff suggests was both the owner of – and Plaintiff's employer while aboard – the George A. Stinson), and (2) assumed the post-November 1, 1961 liabilities of National Steel (which was created in part by The M.A. Hanna Company, and whose vessels were managed by The M.A. Hanna Company). In addition, the Court notes that, implicit in Plaintiff's argument is the suggestion that The M.A. Hanna Company is, for liability purposes, the same as the current Defendant M.A. Hanna Company (after having transitioned through with an interim name of Hanna Mining).

Moreover, Plaintiff asserts that it was Defendant who made the decisions to place asbestos materials aboard the vessels at issue, and implies that it is therefore the entity properly named as a defendant in this asbestos action.

## C. **Analysis**

### Wrong Shipowner

The parties do not dispute that an unseaworthiness claim lies only against the owner (or owner pro hac vice) of a vessel. Defendant contends that U.S. Coast Guard records confirm that, during the relevant time period, it was not the owner of the George A. Stinson and that, instead, the owner of the vessel was Wilmington Trust Company (which had bareboat (demise) chartered the vessel to Stinson, Inc. in 1988). Plaintiff disputes this and contends that, during the time of his employment aboard the vessel, Defendant owned – or held itself out as the pro hac vice owner of – the vessel and is therefore the entity properly liable for unseaworthiness.

In addition, and in the alternative, Plaintiff suggests that, even if Defendant's assertion of ownership of the ships is correct, Defendant is nonetheless liable. Plaintiff suggests that this is because Defendant M.A Hanna (which was previously Hanna Mining and was one of three equal joint venturers comprising Hansand Steamship), was one and the same as (and with) the entity that bought the ship from National Steel (i.e., Skar-Ore Steamship) and which then, on paper, sold the ship in 1988 to Wilmington Trust Company (the entity Defendant asserts owned the ship). Plaintiff suggests that this joint venture is evidenced by the fact that Defendant was one of four entities that entered into an intercompany agreement (also including Skar-Ore Steamship, National Steel, and Hansand

Steamship (the last of which was a conceded joint venturer with Defendant)) – and implies that Wilmington Trust and/or Stinson, Inc. (the entities by which Defendant contends the vessel was owned and bareboat chartered, respectively) was merely one more entity acting as a joint venturer with all of these intertwined entities. Plaintiff suggests that Defendant may face liability (by way of contractual agreement to assume the post-1961 liabilities of National Steel) to the extent that National Steel was a joint venture with the entity that was the owner (or pro hac vice owner) of the vessel.

Furthermore, Plaintiff suggests that he should not have to guess who to sue – and that, if he named a Defendant other than that which was technically the owner (or pro hac vice owner) of the vessel, Defendant can seek indemnity from whichever of the other entities it deems appropriate.

The Court considers the evidence surrounding each of Plaintiff's theories of liability in turn:

(i)  Liability As *Pro Hac Vice* Owner (By Bareboat/Demise Charter)

Plaintiff worked aboard the George A. Stinson during the period of November 1989 to January 1992. Coast Guard records indicate that, during this period, the ship was owned by Wilmington Trust. Under Third Circuit law, there is a presumption against a finding of demise charter, unless it is clear from the facts and evidence that a demise charter was intended. See Matute, 931 F.2d at 235; Aird, 169 F.2d at 609-10. With respect to this particular time period, Plaintiff has not presented any evidence that Defendant Hanna Mining (or M.A. Hanna) was given "sole possession and control of the vessel for voyage or service contemplated." Aird, 169 F.2d at 611; see also Matute, 931 F.2d at 235. In fact, there is some evidence to the contrary: the March 25, 1988 "Management Agreement" presented by Plaintiff – although not executed by Stinson, Inc. – indicates that (1) it was Stinson, Inc. who was the "bareboat charterer," and that Defendant (M.A. Hanna) was merely a manager of the vessel, who was to "perform all the customary duties of a managing agent," and (2) "[n]othing in this Agreement shall be construed as giving [Defendant] control or possession of the Vessel . . . [and that] [u]ltimate control over the operation and navigation of the Vessel shall remain with [Stinson, Inc.]." (Doc No. 92-4) As such, no reasonable jury could conclude from the evidence presented that Defendant was a "demise charterer"

31

or "bareboat charter" such that it took on the status and
liabilities of a pro hac vice owner of the vessel. See Aird, 169
F.2d at 611; Matute, 931 F.2d at 235; Reed, 307 F.2d at 205.

## (ii) Joint Venturer and/or Contractual Liability

Plaintiff suggests that Defendant is liable for his
injuries to the same extent as the entity who was the legal
owner (or pro hac vice owner) of the vessel, by way of joint
venture and/or contractual liability. A timeline summarizing the
evidence surrounding the pertinent relationships and
transactions is as follows:

- 1929 - The M.A. Hanna Company (an Ohio company) helped
  form National Steel
- 1950's (through early 1990's) - The M.A. Hanna Company
  manages numerous National Steel vessels - and (as
  evidenced by contracts in 1950, 1955, and 1960)
  National Steel gives The M.A. Hanna Company
  care/handling/management of all of its future vessels
- 1951 - Hansand Steamship Corporation is formed
- 1953 - Hanna Coal & Ore Corporation, National Steel,
  and Hansand Steamship - all Delaware entities - are
  "employing company[ies]" identified in an "Inter-
  Company Agreement," with mutual/combined funds for
  pension plans, life insurance, health insurance, and
  medical insurance)
- 1958 - Hanna Mining Company is formed (by way of
  merger of numerous coal, ore, and steamship
  corporations)
- 1958 - Hanna Mining Company purchases a minority
  interest in The M.A. Hanna Company
- 1960 - Hanna Mining Company assumes liabilities of
  National Steel accruing after November 1, 1961 (in
  connection with certain vessels - not including the
  George A. Stinson, which was not yet built)
- 1971 - Hansand Steamship Corporation has (at some
  point since 1951) become a joint venture (between
  equal owners Hanna Mining, Wheeling Pittsburgh Steel
  Corporation, and Sand Products Corporation
- 1978 - George A. Stinson is built for National Steel
- 1978 - Hanna Mining begins management of George A.
  Stinson for National Steel (by way of 1950/60s
  contracts)

- 1984 (August) – George A. Stinson is sold by National Steel to Skar-Ore
- 1984 (August) – Hanna Mining continues management of George A. Stinson now owned by Skar-Ore (by way of Management Agreement dated August 31, 1984)
- 1984 (September) – Inter-Company Agreement of 1953 is Amended to add Skar-Ore (and now includes Hanna Mining, National Steel, Hansand Steamship, and Skar-Ore – all Delaware entities – as "employing company[ies]" with mutual/combined funds for pension plans, life insurance, health insurance, and medical insurance)
- 1984 (beginning at some point in the 1950s or 1960s and continuing through as late as September 1984) – Hanna Mining negotiated group benefits for itself, Skar-Ore, National Steel, Hansand Steamship, and Hanna Furnace
- 1985 – Hanna Mining becomes M.A. Hanna Company (a Delaware entity)
- 1988 (March 23) – George A. Stinson is sold by Skar-Ore to Wilmington Trust (for the benefit of GATX Third Aircraft Corporation)
- 1988 (March 25) – George A. Stinson is bareboat/demise chartered by its owner to an entity named Stinson, Inc.
- 1988 – George A. Stinson continues to be managed by M.A. Hanna (by way of agreement with Stinson, Inc.)
- 1989-92 – Plaintiff works aboard George A. Stinson

Coast Guard records identify Wilmington Trust as the owner of the vessel. Both Mr. Pyke and the (not fully executed) 1988 Agreement between Stinson, Inc. and M.A. Hanna indicate that, during Plaintiff's period of work aboard the vessel, it was bareboat chartered by its owner to Stinson, Inc. Although the 1988 Agreement does not indicate who owns the George A. Stinson, it suggests that National Steel is in control and possession of the vessel (although designated as a "time charterer"). (Doc. No. 92-4 at ¶ 18 ("In the event of the termination of the **Time Charter of the Vessel from [Stinson, Inc.] to National Steel Corporation** arising through loss of such Vessel or otherwise, the compensation shall continue until the business of the Vessel has been completed by [M.A. Hanna].") (emphasis added).) If National Steel had sufficient control and ownership of the vessel, it would be the pro hac vice owner of

33

the ship. See Matute, 931 F.2d at 235; Aird, 169 F.2d at 609-10. If, in addition, the evidence was sufficient to support a finding that Defendant M.A. Hanna was a joint venturer with National Steel, it would render Defendant liable (as a joint venture) for any liability of National Steel (such as liability as pro hac vice owner of a ship). See Hudson, 535 A.2d at 1363; Clifton, 73 Ohio App.3d at 211. (It is worth noting here that, although Defendant assumed the post-1961 liabilities of National Steel in connection with certain vessels, George A. Stinson was not one of those vessels. As such, any liability of National Steel that Defendant may bear would be by way of joint venture, rather than its contractual assumption of National Steel's liabilities.)

The 1988 Agreement regarding management of the vessel does not indicate what law applies – although it acknowledges that both parties to the agreement are Delaware entities. Evidence elsewhere in the MARDOC records pertaining to operation of the ships sometimes identified as the "Hanna Fleet" indicate that Ohio law governed those contracts. See, e.g., 2:11-cv-32123 (Doc Nos. 109-2 and 109-3). As such, liability for any joint venture is likely governed by either Delaware law or Ohio law. Therefore, the Court has reviewed the evidence in the record with an eye toward the elements of a joint venture, as set forth by courts in Delaware and Ohio. Ford, 163 Ohio St. 498; J. Leo Johnson, Inc., 38 Del. Ch. 579; Warren, 414 A.2d 507 (Delaware law); Carey, 1994 WL 124849 (Ohio law); Mill Creek Builders, Inc., 1991 WL 270419 (same).

Defendant's discovery responses confirm that Hansand Steamship Corporation was formed in 1951 and, in 1971, was an equal joint venture among three corporations – one of which was Defendant M.A. Hanna (then known as Hanna Mining). There is evidence that Defendant negotiated benefits for, inter alia, itself, Hansand Steamship, and National Steel. There is evidence that Defendant helped form National Steel. There is evidence that Defendant assumed many of the post-1961 liabilities of National Steel (by way of contract). There is evidence that the ship was built for National Steel. The Court takes judicial notice that the ship was named after the former Chairman of the Board and CEO of National Steel (George A. Stinson). See, e.g., George A. Stinson, 84, Dies; Lawyer and Steel C.E.O., N.Y. Times (Nov. 26, 1999), available at http://www.nytimes.com/1999/11/26/ us/george-a-stinson-84-dies-lawyer-and-steel-ceo.html; http://www.americansteamship.com/fleet/mv-american-spirit.php; and http://www.aimehq.org/programs/award/bio/george-stinson.

There is evidence that the entity which Defendant contends was the pro hac vice owner of the ship while Plaintiff was aboard it bore the name of that CEO (as well as the vessel): Stinson, Inc. There is evidence that Stinson, Inc. bought the vessel from Skar-Ore (an entity that was a party to the Inter-Company Agreement with inter alia, National Steel and Hansand Steamship (in which Defendant was a joint venturer)). There is evidence that Defendant managed the ship from the time it was built up through the time of Plaintiff's work aboard it - even as it changed ownership from National Steel to Skar-Ore and then to Wilmington Trust - and even as it may have been bareboat chartered to Stinson, Inc.

        Importantly, however, although a lay person (such as a juror) might conclude from the facts and relationships that all of the entities discussed herein are acting in a joint venture and/or that National Steel was the actual pro hac vice owner of the ship (by way of bareboat charter), the evidence in the record is insufficient under the law to survive summary judgment. See Hudson, 535 A.2d at 1363; Clifton, 73 Ohio App.3d at 211. In other words, under current applicable law, no reasonable jury could conclude from the evidence that Stinson, Inc. (the purported bareboat charterer of the vessel) or Wilmington Trust (its purported owner) was a joint venturer with Defendant or National Steel (or any other entity discussed herein). See id. This is because, for the years at issue (1989 to 1992), there is no evidence in the record that Defendant or National Steel (or any other entity discussed herein) had: a contract (express or implied) with Stinson, Inc. (or Wilmington Trust); the intent to associate as a joint venturer with Stinson, Inc. (or Wilmington Trust); a community of interest in the performance of a common purpose with Stinson, Inc. (or Wilmington Trust); joint proprietary interest in any aspect of the ship (or its operation) with Stinson, Inc. (or Wilmington Trust); joint control or right of control with Stinson, Inc. (or Wilmington Trust) in connection with the ship (or anything else); a right to share with Stinson, Inc. (or Wilmington Trust) in the profits surrounding the ship; a duty to share with Stinson, Inc. (or Wilmington Trust) in the losses which may be sustained in connection with the ship. As such, under Delaware law and Ohio law, Plaintiff's evidence is insufficient to establish liability on the part of Defendant by way of joint venture and/or contractual liability. See id. (The Court notes that this outcome would be the same under any state's law. See 46 Am. Jur. 2d Joint Ventures § 1.)

There is also no evidence in the record that the naming of Wilmington Trust as the owner of the ship – or the purported naming of Stinson, Inc. as its bareboat charterer – was in any way an effort to avoid liability on the part of Defendant or National Steel (or any other entity discussed herein) in connection with injuries arising on the ship. As such, under Delaware law and Ohio law, Plaintiff's evidence is insufficient to establish liability on the part of Defendant by way of disregarding of Wilmington Trust (or Stinson, Inc.) as a "sham" corporate entity. See Martin v. D.B. Martin Co., 10 Del. Ch. 211, 213, 88 A. 612, 613 (Del. Ch. 1913)(discussing scenarios in which a court may "disregard formalities and break through the shell of fictions in order to prevent or undo fraud, where the formalities and fictions have been used to accomplish a fraud" – such as when "failing partners, to avoid creditors, turned over their business to a corporation, of which they were the stockholders and officers"); Kays v. Schregardus, 138 Ohio App.3d 225, 740 N.E.2d 1123 (Ohio App. (11th Dist. 2000) (explaining that "sham corporations" are "legal fictions," which "may be disregarded when asserted for [unlawful] purposes"); Westrick v. Fish Boat, Inc., 1981 WL 5603, at * 3-6 (Ohio App. (6th Dist. 1981) (discussing scenarios where "sham corporations" may be disregarded, including "where the corporation was a sham to accomplish some ulterior purpose, [such as] to evade some statute or to accomplish some fraud, or where the corporation was a mere instrumentality or agent of another corporation"). (The Court notes that this outcome would be the same under any state's law. See 18 Am. Jur. 2d Corporations § 58 ("Use of corporate device to avoid obligations or responsibility").)

Because Plaintiff has not presented evidence sufficient to support either theory of liability arising in connection with ownership of the ship, Defendant is entitled to partial summary judgment (with respect to claims for unseaworthiness arising under the general maritime law) on the grounds that Plaintiff has not established that it was the "owner" (or pro hac vice owner) of the ship. See Anderson, 477 U.S. at 248-50.

## Wrong Employer

Defendant next contends that it cannot be liable on Plaintiff's Jones Act claims because it was not Plaintiff's employer during his work aboard the two ships at issue. The parties do not dispute that a Jones Act claim for negligence lies only against the plaintiff's employer at the time of the

36

alleged asbestos exposure. Defendant contends that, during Plaintiff's time working aboard the ship, his employer was Stinson, Inc. Plaintiff disputes this and contends that, during his employment aboard the George A. Stinson, Defendant was his employer (or at least held itself out as Plaintiff's employer) and is therefore the entity properly liable for negligence pursuant to the Jones Act.

Again, and in the alternative, Plaintiff suggests that, even if Defendant's assertion of ownership of the ship is correct, Defendant is nonetheless liable as a joint venturer with the entity(ies) which was Defendant's employer(s) (including, specifically, Stinson, Inc. and perhaps other entities, such as Skar-Ore and National Steel (an entity whose post-1961 liabilities Defendant assumed by way of contract)).

The Court considers the evidence surrounding each of Plaintiff's theories of liability in turn:

(i)     Liability As Employer

Plaintiff worked aboard the George A. Stinson during the period of November 1989 to January 1992. There is evidence (from the first two of Plaintiff's four certificates of discharge issued by the United States Coast Guard in December of 1989 and October of 1990) that his employer was Defendant ("M.A. Hanna Company"). (ECF No. 76-5.) There is evidence to contradict this in the form of testimony from Mr. Pyke (one of Defendant's former officers), who states that Defendant was merely an agent/manager for the ship and not an employer, and who identifies Stinson, Inc. as the employer, supervisor, payor, and provider of benefits for Plaintiff (albeit without any supporting documentation). In light of this directly contradictory evidence, there is a genuine dispute of material fact as to whether Defendant was Plaintiff's employer.

Although Defendant has also submitted evidence from Social Security records indicating that Plaintiff received payment from an entity other than it (and, specifically, Stinson, Inc.) in 1989, 1990, 1991, and 1992, the evidence does not establish that Plaintiff was not also employed by Defendant during those years. This is because (1) in a manner deviating from that of the rest of the record, the entries for Stinson, Inc. do not specify for which quarters of the year payment was made to Plaintiff, and (2) the document omits a page (page 6) – the very page on which one would expect to find additional

37

payment information for the years 1989 through 1992. The nature of Plaintiff's work was such that he often had multiple employers during the course of a single year (even the same quarter) and could have received payment by both Defendant and Stinson, Inc. in the same year (or even the same quarter). Without the complete Social Security payment record, the evidence does not establish that Plaintiff was not paid by Defendant during these years.

Similarly, while the 1988 Agreement laying out the roles and duties to be performed by Defendant do not identify it as having an employer's role (i.e., hiring, firing, supervising, or paying the ship's crewmen, such as Plaintiff), the Agreement does not establish that Defendant was not Plaintiff's employer while aboard the ship because (1) it is not fully executed (i.e., it is signed by Defendant but is not signed by Stinson, Inc.), and (2) does not preclude the possibility that Defendant also performed duties such as hiring, firing, supervising, and paying crewmembers (in addition to the duties outlined in the Agreement). In fact, the Agreement suggests that Defendant has at least some amount of control in the decisions to hire and fire, and plays at least an intermediary role in paying the crew - factors that support a finding that there was an employment relationship. (See Doc. No. 92-4 at ¶¶ 4(a), 4(i), 4(j), 8, 9, and 10 et seq.) See Cosmpolitan Shipping Co., 337 U.S. at 785-800; Matute, 931 F.2d at 235-36. Under Third Circuit law, the existence of the employment relationship is a question of fact. Reeves, 26 F.3d at 1253 (citing Matute, 931 F.2d at 236). There is sufficient evidence from which a reasonable jury could conclude that Defendant acted as Plaintiff's employer during his work aboard the George A. Stinson - at least during the years 1989 and 1990 (the two years for which the Coast Guard discharge certificates identify Defendant as his employer). See Cosmopolitan Shipping Co., 337 U.S. at 795. Accordingly, partial summary judgment in favor of Defendant on grounds that it was not Plaintiff's employer while he worked aboard the two ships discussed herein is not warranted. Anderson, 477 U.S. at 248-50.

(ii)    Joint Venturer and/or Contractual Liability

Defendant asserts that Stinson, Inc. was Plaintiff's employer while aboard the George A. Stinson. Plaintiff contends that, even if this is true, Defendant is still liable for his injuries aboard the ship by way of joint venture liability and/or contractual liability. As explained already at length

AND IT IS SO ORDERED.

_[signature]_

EDUARDO, C. ROBRENO, J.

---

above, there is not sufficient evidence in the record to support such a finding under this theory of liability.

Because Plaintiff has presented evidence sufficient to support his first theory of liability arising in connection with employment aboard the ship, Defendant is not entitled to partial summary judgment (with respect to claims for negligence arising under the Jones Act) on the grounds that it was not Plaintiff's employer. See Anderson, 477 U.S. at 248-50.

## D. Conclusion

Defendant's motion for partial summary judgment (as to Plaintiff's general maritime law claim for unseaworthiness) on grounds that it did not own the ship at issue is granted.

Defendant's motion for partial summary judgment (as to Plaintiff's Jones Act claim for negligence) on grounds that it was not Plaintiff's employer while he was serving aboard the ship at issue is denied because Plaintiff has presented sufficient evidence from which a reasonable jury could conclude that Defendant acted as his employer for at least part of the time period at issue (i.e. 1989 and 1990).